IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA
No. 13-5048

_____

|                                                      |     |
|------------------------------------------------------|-----|
|                                                      | )   |
| Larry Hagan, Individually and as Father and          | )   |
| Next Friend of Minor L.C.H. and L.C.H.,              | )   |
| Minor by and through his Father and Next             | )   |
| Friend, Larry Hagan,                                 | )   |
|                                                      | )   |
|                       Appellants,                    | )   |
|                                                      | )   |
|                 v.                                   | )   |
|                                                      | )   |
| UNITED STATES OF AMERICA                             | )   |
|                                                      | )   |
|                       Appellee.                      | )   |

_____ )

**APPELLANTS' OPPOSITION TO MOTION FOR SUMMARY
AFFIRMANCE**

Appellants Larry Hagan, Individually and as Father and Next Friend of

Minor L.C.H. and L.C.H., Minor by and through his Father and Next Friend, Larry

Hagan, hereby provide their Opposition to Appellee's Motion for Summary

Affirmance:

**PROCEDURAL BACKGROUND**

The instant motion arises from the appeal of the December 14, 2012 final

order of the United States District Court of the District of Columbia (The

Honorable Robert J. Wilkins, presiding) which dismissed with prejudice

Appellants' action brought under the Federal Tort Claims Act, ("FTCA"), 28

1

U.S.C. § 1346.  See **Attachments 1 and 2**, Memorandum Opinion and Order from the United States District Court for the District of Columbia, D. 21 and 22 respectively. [1]

Appellants originally filed their Federal Tort Claims on July 23, 2010.  Their Complaint (D. 1) was filed and served in June 2012.  Appellants' claimed that the medical negligence of the Appellee caused – *inter alia* – severe, permanent neurologic impairment to L.C.H. and caused Mr. Hagan to suffer damages as well. D. 1 at ¶¶ 124, 126.

On September 24, 2012, Appellee filed a Motion to Dismiss for lack of subject matter jurisdiction for failure to meet the jurisdictional prerequisite of 28 U.S.C.§2401(b).  (D. 13) In response, Appellants filed their Memorandum in Opposition, including an Affidavit by Appellant Larry Hagan, D. 14, Attachment 1. ("D. 14-1")

The gravamen of Appellee's Motion to Dismiss was an alleged failure of the Appellants to comply with the applicable statute of limitations.  The crux of the issue was determination of the particular injury to L.C.H. which triggered accrual of the underlying cause of action.  Appellee argued that said injury was a *stroke* suffered by L.C.H. in September 2007. Appellants instead argued that the injury was *not* the September 2007 stroke – from which Appellants were told for well

---

[1] "D." followed by a number indicates the docket number assigned to certain document on the docket sheet of the District Court.

2

over a year that L.C.H. had recovered – but, rather, a March 2009 diagnosis of

L.C.H. with a severe and permanent neurologic condition known as hypoxic

ischemic encephalopathy ("HIE") which was not diagnosed until March 2, 2009.

Oral argument was heard before Judge Wilkins on November 26, 2012. On

December 14, 2012, the District Court granted Appellee's motion with prejudice.

Appellants noticed their Appeal on February 11, 2013. The instant motion and

memorandum by Appellee followed.

## FACTUAL BACKGROUND

Appellant L.C.H. was born in April 2007 at the Bethesda National Naval

Medical Center, ("NNMC") at 24 weeks and five days gestational age.[2] D. 1 at ¶

16. Because of his extreme prematurity, prior to the events underlying the instant

claim, L.C.H. was eligible for and received services from his local county

government. As a premature infant, L.C.H. was expected to have delayed

milestones.[3] Thus even prior to the events referenced in Appellants' claim, Mr.

Hagan was aware that L.C.H. would likely not develop in as timely a manner as a

full term infant.

L.C.H. was discharged home in June 2007, approximately 10 weeks after his

birth. D. 1 at ¶ 21. In August 2007, L.C.H. was admitted to Walter Reed Army

---

[2] Full term gestational age is 40 weeks, thus L.C.H. was born almost 16 weeks
prematurely.
[3] http://www.webmd.com/parenting/baby/tc/premature-infant-looking-ahead-to-
the-childhood-years

3

Medical Center ("Walter Reed") due to gastrointestinal distress/suspected bowel obstruction and subsequently discharged.  D. 1 at ¶¶ 22-25, 38.  L.C.H. was thereafter seen in follow-up at NNMC on three occasions later in August 2007 with continued gastrointestinal ("GI") distress.  D. 1 at ¶¶ 42, 43, 45, 49, and 50.

On September 8, 2007, L.C.H. was seen at DeWitt Army Community Hospital with GI distress and was referred to NNMC.  D. 1. at ¶ 56.  He was then air-lifted from NNMC to Walter Reed due to concern regarding bowel obstruction and need for surgery.  D. 1 at ¶ 66. L.C.H. remained at NNMC and Walter Reed for a combined 16 ½ hours on September 8-9, 2007 *without receiving surgery*.  D. 1 at ¶ 75-78.  L.C.H. required emergent intubation at Walter Reed and his condition deteriorated to the point where he suffered a stroke.  D. 1 at ¶¶ 83, 86.

L.C.H. was ultimately transferred via ground transport to Children's National Medical Center ("CNMC") the morning of September 9, 2007, and the first of numerous abdominal surgeries was performed that day.  D. 1 at ¶¶ 89, 92. Since that time, L.C.H. has undergone many exploratory abdominal surgeries, he has lost a large portion of his small bowel, he has sustained multiple infections due to intravenous lines, and he has required feeding intravenously via total parenteral nutrition.  D. 1. at ¶¶ 95, 99-100.

In September 2007, Mr. Hagan was told that L.C.H. had suffered a stroke. However, in the following weeks and months – indeed for well over a year – Mr.

4

Hagan was repeatedly told that L.C.H. had not suffered any complications from his stroke. Mr. Hagan accepted these statements as true, as set forth in his affidavit submitted with Appellants' Opposition to Appellee's Motion to Dismiss. (D. 14-1) This Affidavit unequivocally states that, while L.C.H. did have a stroke in September 2007, Mr. Hagan was repeatedly reassured for over a year by many of L.C.H.'s health care providers that L.C.H. had suffered no damage from his stroke. [4] Significantly, L.C.H. was first diagnosed with the neurologic disorder hypoxic ischemic encephalopathy in March 2009. D. 1 at ¶ 103. L.C.H. is now six years old and he is permanently neurologically impaired. It is this injury for which Appellants seek compensation. D. 1 at ¶ 112.

## ARGUMENT

### I.   Appellee Has Fallen Short of Meeting the Stringent Requirements for Summary Affirmance

This Circuit has understandably set the bar very high for granting motions for summary affirmance, given that granting such motions short circuits the entire appeal process and deprives a putative Appellant of an appeal of right afforded by the Federal Rules of Civil Procedure:

> A party seeking summary disposition bears the heavy burden of establishing that the merits of his case are so clear that expedited

---

[4] In his Memorandum Opinion, Judge Wilkins contends that Mr. Hagan's Affidavit failed to rebut why the accrual clock should not have started at the time Mr. Hagan was informed of the stroke in September 2007. Appellants submit that ¶¶ 9-24 specifically rebut such a contention. D. 14-1 at ¶¶ 9-24.

> action is justified. *See Walker v. Washington*, 201 U.S. App. D.C. 82,
> 627 F.2d 541, 545 (D.C.Cir.), *cert. denied*, 449 U.S. 994, 101 S. Ct.
> 532, 66 L. Ed. 2d 292 (1980). To summarily affirm an order of the
> district court, this court must conclude that no benefit will be gained
> from further briefing and argument of the issues presented. *Sills v.
> Bureau of Prisons*, 245 U.S. App. D.C. 389, 761 F.2d 792, 793-94
> (D.C. Cir. 1985). In addition, this court is now obligated to view the
> record and the inferences to be drawn therefrom "in the light most
> favorable to [taxpayers]." *United States v. Diebold, Inc*., 369 U.S.
> 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962).

*Taxpayers Watchdog, Inc. v. Stanley*, 260 U.S. App. D.C. 334, 819 F.2d 294, 297-298 (D.C. Cir. 1987).  Further, in considering a motion for summary affirmance, the court imposes on a party who requests summary affirmance or summary reversal a 'heavy burden.' *United States v. Glover,* 731 F.2d 41, 44 (D.C. Cir. 1984)  Here, the arguments advanced by Appellee fail to satisfy the rigorous standards articulated by the Court in *Taxpayers* and *Glover.*

Underlying the erroneous dismissal of this case was the District Court's ultimate determination that the "injury" which triggered the accrual of this cause of action was a *stroke* and not HIE.  This finding was made by the District Court in a vacuum, absent the jurisdictional discovery to which Appellants were entitled as a matter of law.[5] Appellants were therefore deprived of their opportunity to take

---

[5] Appellee contends that Appellants failed to move for jurisdictional discovery, overlooking entirely the Rule 56(d) Affidavit submitted with Appellants' Opposition to the Motion to Dismiss.  D. 14-1 at pp. 000078-83. *See Cheyenne Arapaho Tribes of Oklahoma v. United States of America, et al.*, 385 U.S. App. D.C. 76, 80, 558 F.3d 592, 596 n.3, (D.C. Cir. 2009) (holding that a Rule 56(f)

testimony from the providers treating L.C.H. regarding the evident lack of

neurologic damage from the stroke until the HIE was finally diagnosed.  Their case

having been dismissed by such a rush to judgment, the Appellants are entitled as a

matter of right to present their full appellate brief to this Honorable Court.

## II.     The Merits of Appellants' Position Alone Demand Denial of the Instant Motion

The Court in *Taxpayers* held that Appellee must demonstrate that the merits

of its position were so strong as to render an appeal of no use to this Court.  The

*Taxpayers* Court also held that this Court *must* view the record and the inferences

drawn in a light most favorable to the Appellants.  Review of the merits alone

reveals why further briefing and argument is required in this case.

The question critical to the timeliness of this action was well stated by the District

Court in its Memorandum Opinion:  "What is critical here are the neurologic

consequences…and when Hagan learned of them." (D. 21 at 3).

Again, the injury for which Appellants seek redress is HIE.  Both the

medical records and Mr. Hagan's affidavit clearly substantiate that L.C.H. showed

no evidence of neurologic damage of which Mr. Hagan should have been aware

and that L.C.H. was not diagnosed with HIE until March 2009.  Prior to that date,

this diagnosis was wholly absent from the medical records.  Mr. Hagan cannot be

---

[now Rule 56(d)] affidavit can be used in support of a Rule 12(b)(1) motion to
dismiss).

charged with knowledge of information that simply did not exist. *See Urie v. Thompson*, 337 U.S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949) (holding that awareness of the unknown or inherently unknowable cannot be imputed to a party).

L.C.H.'s medical records show that, on November 21, 2007, (two months after L.C.H.'s stroke), his gastrointestinal specialist Dr. Clarivet Torres noted in a letter to pediatric surgeon Anthony Sandler, "…he [L.C.H.] had a rough post-operative stay…but over came all of these problems." D. 14-1 at pp. 000002-3. Records from L.C.H.'s pediatric primary care visit at NNMC on December 13, 2007 reveal that in her assessment and plan, Dr. Tiffany Ohta stated "On exam, there does not appear to be neurologic sequelae." D. 14-1 at pp. 000007. [6]

L.C.H. had another visit with Dr. Ohta on January 24, 2008, and her record reiterated "mental status normal" and "currently with no apparent neurologic sequelae from stroke associated during initial admission to CNMC in Aug/Sep 2007." D. 14-1 at pp. 000010-11. On February 21, 2008, L.C.H. was seen by Dr. Ohta at NNMC. Dr. Ohta observed, "mental status normal" and "S/p [status post] apparent stroke at CNMC Aug/Sep 2007 without significant neurologic sequelae." D. 14-1 at pp. 000017-18.

---

[6] L.C.H. has additional medical records that support Appellants' position but not included given the page limits of this Opposition. This is yet another reason why an appeal has tremendous merit in this case.

Further, a note from L.C.H.'s April 10, 2008 appointment with Dr. Ohta at NNMC shows that L.C.H. had been seen by neurology in February 2008 *and the evaluation was normal*. D. 14-1 at p. 000021. ("Does not appear to have long term neuro sequelae, normal tone. No urgent need for f/u [follow-up] MRI at this time. *F/u with neuro as needed in future*.") (emphasis added). D. 14-1 at pp. 000021-22. L.C.H.'s mental status findings were repeatedly noted to be "normal," including during a visit with Dr. Ohta on June 5, 2008. D.14-1 at p. 000025.

L.C.H. was seen on July 25, 2008 by Dr. Arne Andersen at NNMC. Dr. Andersen noted "concern for a hypoxemiac event." This can hardly be deemed a certain diagnosis. D. 14-1 at p. 000028. Further, the reason for visit was cited as "patient *at risk for* developmental delay" D. 14-1 at p. 000029. (Emphasis added). This is again far from a firm diagnosis of developmental delay. Moreover, although a notation regarding microcephaly (literally, a small head considering one's age and sex) was made in the record, there is no evidence that this finding and any potential ramifications it may have had for L.C.H. were discussed with Mr. Hagan.[7]

A September 23, 2008 note by Dr. Clarivet Torres of CNMC said of L.C.H. "Neurological exam is grossly normal." D. 14-1 at p.000033. A September 16,

---

[7] In any event, Appellants' administrative claim was submitted to the appropriate agencies on July 23, 2010, which was within two years of this initial finding by Dr. Andersen.

2008 note from Dr. Ohta at NNMC said "a motor exam exhibits no dysfunction."

D. 14-1 at p. 000038.

An October 15, 2008 letter/note by Dr. Clarivet Torres stated of L.C.H.,

"Neurological exam was grossly normal."  D. 14-1 at p. 000041.  Dr. Torres

repeated this regarding an October 29, 2008 visit, D.14-1 at p. 000049; a

November 19, 2008 visit D. 14-1 at p. 000053; and a December 10, 2008 visit.

D.14-1 at p. 000057.  A physical therapy note from October 29, 2008 noted that

L.C.H's findings were "WNL [within normal limits]" and "without concern at this

time." D. 14-1 at p. 000046.

On March 2, 2009, L.C.H. was seen and evaluated by Dr. Jason N. Harris

(resident physician) and *pediatric neurologist* Dr. Marleigh Erickson at Walter

Reed.  There, for the first time, L.C.H. was diagnosed with the condition of

"**HYPOXIC ISCHEMIC ENCEPHALOPATHY**." D. 14-1 at p. 000073.  Even

on that date, the pediatric neurologist Erickson noted that L.C.H.'s motor skills

were "surprisingly well developed considering what one might expect from

looking at MRI." D. 14-1 at p. 000073.

Appellants filed their claim on July 23, 2010, well within the two year statute of limitations under a discovery rule,[8] as the injury of HIE was not discoverable or knowable until March 2009.

This jurisdiction has addressed the discovery rule, initially set forth in *United States v. Kubrick,* 444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979), in *Lewis v. United States*, 290 F. Supp. 2d 1 (D.D.C. 2003), a case in which the plaintiff prevailed on the statute of limitations issue.  In *Lewis*, a mother alleging medical malpractice against the United States regarding alleged birth injuries to her child endeavored to determine the nexus of the birth injuries to the care and treatment provided.  *Id.* at 2.

In vacating a previous order of dismissal on statute of limitations grounds, the Court held, "[a]s the Ninth Circuit explained in *Winter v. United States*, 244 F.3d 1088 (9th Cir. 2001), a plaintiff, who is a layman without medical knowledge, cannot be expected to know the cause of his or her injuries, despite the uncertainty of his or her own treating doctors." *Id.* at 5 (citing *Winter*, 244 F.3d at 1091).Here, L.C.H.'s treating doctors did not express *uncertainty* about neurologic injury in the wake of L.C.H.'s stroke.  They did not state that L.C.H. "might" have some complications from his stroke.  Rather, the records unequivocally state that L.C.H.

---

[8] To the extent that the Appellee has argued that a finding of "microcephaly" by Dr. Arne Andersen on July 25, 2008 marks the accrual of this claim, Appellants' claim is still therefore timely.

had *no* neurologic complications, which places Appellants' claim on even stronger

footing than that of the prevailing plaintiff in *Lewis*.[9]

Moreover, in order for a claim to accrue, the claimed injury must be

determined and correctly diagnosed. Indeed, this Court must consider the injury at

issue, as the Court did in *Monday v. United States*, 688 F. Supp. 788, 790 (D. Me.

1988). In *Monday*, parents sought compensation for their child's cerebral palsy,

which they alleged resulted from negligently inflicted birth injuries. In holding that

the claim did not accrue at birth, but rather when the child was later diagnosed with

permanent injury, the Court stated:

> The injury for which the Mondays seek to recover *is not merely the*
> *respiratory distress and complications Christopher suffered at birth,*
> *but the cerebral palsy they claim was caused by the traumatic birth.*

*Id.* (emphasis added). Further, Mr. Hagan was not required to file a claim "in

case" L.C.H. developed neurologic injury. *See Nicolazzo v. United States*, 786

F.2d 454, 457 (1st Cir. Mass. 1986) (concluding that the statute of limitations did

not begin to run until the plaintiff received the correct diagnosis, nine years after

his initial treatment).

---

[9] The District Court made reference to an entry in the medical records --
"without *significant* neurologic sequelae" -- in its Memorandum Opinion in
making the argument that this entry did not mean that L.C.H. had *no* neurologic
sequelae. Appellants aver that this is an insignificant distinction.

It must be noted that "stroke" and "hypoxic ischemic encephalopathy" are not synonymous. L.C.H.'s "stroke" occurred from an event or state of impaired blood flow ("ischemia") and impaired oxygen flow ("hypoxia") to his brain. "Encephalopathy" is a disease or dysfunction of the brain.[10] Hypoxic ischemic encephalopathy is a brain disorder *that can result* from decreased blood and oxygen flow (a stroke).

The event of a stroke *can* cause the condition of hypoxic ischemic encephalopathy, but this does not mean that L.C.H.'s neurologic fate was sealed from the moment he had a stroke. The same is true of people who suffer an event such as a heart attack. While a heart attack *can* cause permanent cardiac damage, there exists no foregone conclusion that it will. Larry Hagan was told repeatedly that L.C.H. had no long term complications from the stroke he suffered. He had no reason to question this, as he relied on L.C.H.'s treating physicians, as he was entitled to do. D. 14-1 pp. 000075-77.

The opinion of the District Court notwithstanding, the Fourth Circuit case of *Kerstetter v. United States,* 57 F. 3d 362, 363 (4th Cir. Va. 1995) supports Appellants' position here. The parents in *Kerstetter* were given hope that intra-operative kidney failure could reverse itself and relied on that hope. Thus, much like Larry Hagan, the parents were aware of an injury for more than two years

---

[10] *See* F.A. Davis Company, *Taber's Cyclopedia Medical Dictionary*, 18th edition 1997.

prior to the time they filed their claim, but in that case the injury for which

compensation was sought was the permanent injury.  The Court found that the

cause of action accrued when the parents learned the kidney damage was

permanent but it did not impute knowledge of a permanent injury to the parents

until that injury was confirmed.

    As in *Kerstetter,* Larry Hagan knew of an initial insult but he did not learn

until March 2009 that such insult had caused a lasting injury that would affect

L.C.H. for the rest of his life.  Under the *Kerstetter* reasoning, the instant claim

accrued when Larry Hagan first learned that L.C.H.'s harm had not "in fact gone

away" as L.C.H.'s caregivers had assured him it had.  *See also Otto v. National*

*Inst. of Health,* 815 F.2d 985 (4th Cir. Md. 1987) and *Johnson v. United States*,

2005 U.S. Dist. LEXIS 13231 (W.D. Tex. June 30, 2005)( holding respectively

that a claim does not accrue until a party knows of permanent, irreparable injury

and until such time that a correct diagnosis is made).

### III.    Jurisdictional Discovery Which Would Have Further Persuaded This Honorable Court was Wrongfully Denied

This Circuit has established that Appellants are *entitled* to conduct

jurisdictional discovery as a matter of law, and the District Court erred in finding

otherwise:

> We have previously required that plaintiffs be given an opportunity
> for discovery of facts necessary to establish jurisdiction prior to
> decision of a 12(b)(1) motion. *See, e.g.*, *El-Fadl v. Cent. Bank of*

> *Jordan*, 316 U.S. App. D.C. 86, 75 F.3d 668, 676 (D.C. Cir. 1996);
> *Crane v. Carr*, 259 U.S. App. D.C. 229, 814 F.2d 758, 764 (D.C. Cir.
> 1987).

*Ignatiev v. United States*, 345 U.S. App. D.C. 85, 238 F.3d 464, 467 (D.C. Cir.

2001).  Accordingly, Appellants were entitled to conduct discovery both regarding

accrual under the discovery rule and the applicability of equitable tolling.

The facts presented in Appellee's Motion to Dismiss, supporting

Memorandum, and Appendix were inaccurate, insufficient, and full of incorrect

assumptions about what Larry Hagan did or did *not* know about the medical

condition of his son, L.C.H., following the events in August/September 2007.  The

records and declarations constituting Appellee's Appendix in the lower court

reflect a mere *fraction* of the medical care L.C.H. received over the course of his

care and treatment and therefore provided a  an incomplete picture of L.C.H.'s

medical care and prognosis in the months and years following the events of

August/September 2007.

Out of the numerous health care providers who have treated L.C.H.,

Appellee submitted in support of its motion to dismiss declarations from only two

individuals (a social worker and a developmental pediatrician), neither of whom

has been continuously involved in L.C.H.'s care and treatment since the events of

August/September 2007.  Appellants are entitled to present testimony from

L.C.H.'s treating providers at NNMC and Walter Reed (employees of Appellee) and CNMC regarding the recovery L.C.H. made from his September 2007 stroke.

Appellee's assertion that the merits of this case warrant a summary decision flies in the face of the substance of the lengthy oral argument held on the issue of the statute of limitations on November 26, 2012.  Attached are excerpts from the transcript which demonstrate that, on multiple occasions, the District Court questioned Appellee's argument that Mr. Hagan somehow knew of any tissue death in L.C.H.'s brain and that the existence of this tissue death meant that the stroke suffered by L.C.H. in September 2007 had caused a lasting injury to L.C.H.[11] *See* **Attachment 3.**

Appellee even conceded at oral argument that Appellants had made no averment in either the administrative claim or their Complaint that Mr. Hagan knew that L.C.H. suffered tissue death in September 2007.  Instead, the Appellee imputed this knowledge to Mr. Hagan by stringing together content found in L.C.H.'s medical records.  *See Tr. 4:6-22; Tr. 5: 10-16.*  Such an attenuated argument, which *imputes* knowledge to Mr. Hagan, should not have served as the basis for dismissal nor should it serve as the basis for summary affirmance of that dismissal.

---

[11] In fact, Appellee continues to make this argument in its Motion for Summary Affirmance.

The District Court flatly questioned Appellee concerning the flaw in the argument, demonstrating that the draconian measure of depriving Appellants' right to consideration of their appeal by this Honorable Court is neither warranted nor just. *See Tr. 8:11-9:3.* In fact, the district court itself bolstered Appellants' argument that jurisdictional discovery is necessary when it ascertained that the Appellee had *no affidavit* from the physician, Dr. Corriveau, who allegedly conversed with Mr. Hagan regarding the import of L.C.H.'s September 2007 CT scan results. The district court bluntly asked, "*Why doesn't that sink your motion?*" *Tr. 37:14-38:1.* (Emphasis Added)   The absence of this information from Dr. Corriveau is an excellent example of the information that could have been gleaned from jurisdictional discovery.

## IV.    Equitable Tolling Does Apply and Discovery into its Applicability Should Have Been Permitted

Appellee brought its Motion to Dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, alleging lack of subject matter jurisdiction.  Appellants contend it should have been presented under Rule 12(b)(6).  However, as the Court held in *Smith v. United States*:

> Before reaching the merits of the parties' arguments, the Court must rectify an error in the government's presentation of its statute of limitations defense. *Contrary to the government's assertions, "[a] statute of limitations defense . . . is not 'jurisdictional'" in nature. Day v. McDonough*, 547 U.S. 198, 205, 126 S. Ct. 1675, 164 L. Ed. 2d 376 (2006); *see also* Gov't Mem. at 9 ("this Court is without jurisdiction to hear [the p]laintiff's claim because [the p]laintiff failed

17

> to file her initial administrative claim within two years of the accrual of her claim"). This rule applies with equal force to the statute of limitations set forth in § 2401 notwithstanding the jurisdictional nature of sovereign immunity itself, a point this Court recently recognized in *P&V Enters. v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 2d 134 (D.D.C. 2006) (Walton, J.).

518 F. Supp. 2d 139, 147 (D.D.C. 2007) (emphasis added).  Appellee's motion

therefore should have presented under Rule 12(b)(6).

    *Smith* and its predecessors cited above have been followed and cited by

*Recent Past Pres. Network v. Latschar*, 701 F. Supp. 2d 49, 58 (D.D.C. 2010)

(holding that 28 U.S.C. § 2401(a) is not jurisdictional) and *Williams v. Chu*, 641 F.

Supp. 2d 31, 34 (D.D.C. 2009).  ("[T]he defendants cannot invoke Rule 12(b)(1),

which pertains only to dismissals for lack of subject-matter jurisdiction. 'Instead,

the only possible procedural mechanism for considering [the defendants'] statute

of limitations argument at this stage of the proceedings is Rule 12(b)(6).'")

(quoting *Smith*, 518 F. Supp. 2d at 149).

    Notably, a month after the District Court dismissed this case, the United

States Supreme Court addressed these issues in *Sebelius v. Auburn Reg'l Med. Ctr.*,

133 S. Ct. 817, 184 L. Ed. 2d 627 (2013).  In *Sebelius*, the Court held not only that

statutes of limitations are *not* jurisdictional but also that the principle of equitable

tolling can be equally applied whether the defendant is a private individual or the

United States government. *Id*. at 821-22.

Because of Appellee's error in presentment, Appellants are deprived of asserting statutes of limitations defenses, including equitable tolling, in this matter. In *Norman v. United States*, the Court stated that equitable tolling may apply where a plaintiff or complainant has been "induced" or "tricked" by his adversary's conduct to miss a deadline to file a claim. 373 U.S. App. D.C. 312, 467 F.3d 773, 776 (D.C. Cir. 2006). L.C.H.'s primary health care throughout his life has been provided by physicians and other providers who are employees of the Appellee. The evidence will show that these same employees told Mr. Hagan of L.C.H.'s stroke, then continually reported to Mr. Hagan that L.C.H. suffered no complications from this stroke.

The very information which Larry Hagan needed to know – his son's prognosis after his stroke – was largely held by the Appellee via its employees who treated and evaluated L.C.H. subsequent to his stroke. "That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *United States v. Kubrick*, 444 U.S. 111, 122, 100 S. Ct. 352, 359, 62 L. Ed. 259, 269 (1979). This is a classic scenario in which equitable tolling could apply, and Appellants should not be deprived of this defense simply because Appellee failed to properly present its claim.

Appellants are entitled to conduct discovery to and depose L.C.H.'s physicians about these reassuring statements. Certainly, it is possible that L.C.H.'s permanent injury of hypoxic ischemic encephalopathy simply could not or did not present itself to L.C.H.'s health care providers prior to March 2009. Nonetheless, Appellants are entitled to conduct discovery as to whether these statements were made in furtherance of delaying -- or altogether avoiding -- the filing of a claim by Appellants by lulling Mr. Hagan into a false sense of security until such time as the statute of limitations passed.

## V.    CONCLUSION

For the reasons set forth above, Appellee's motion should be denied.


DATED: May 23, 2013

_____/s/_____
David J. Fudala, Esq.
D.C. Court of Appeals Bar No. 30995
Surovell Isaacs Petersen and Levy
P.L.C.
4010 University Dr.
Second Floor
Fairfax, VA 22030
(703) 251-5400 (telephone)
(703) 591-2149 (facsimile)
dfudala@siplfirm.com
Counsel for Appellants

## CERTIFICATE OF SERVICE

On the 23rd day of May, 2013, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

John J. Gowel, Esquire
United States Attorney's Office for the
District of Columbia
Civil Division
555 Fourth Street, NW
Washington, DC 20530
john.gowel@usdoj.gov

_____/s/_____
David J. Fudala, Esquire